IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| FITZPATRICK, Claudia Y.F., | ) |
| | ) |
|    Debtor. | ) Case No. 05-30204 |
| | |
| ROBERT LEE SMITH, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| vs. | ) Adv. No. 05-03030 |
| | ) |
| CLAUDIA Y.F. FITZPATRICK, | ) |
| | ) |
|    Defendant. | ) |

Montgomery, AL
January 31, 2006, 9:33 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

Robert Lee Smith
Pro se
P.O. Box 5146
Montgomery, AL 36103

Mark A. Cavanaugh
Attorney at Law
4252 Carmichael Rd.
Montgomery, AL 36106

Electronic Recorder
Operator:

Linda Bodden

Transcriber:

Patricia Basham
6411 Quail Ridge Drive
Bartlett, TN  38135
9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

INDEX

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Claudia Fitzpatrick | 35 | 38 | -- | -- |
| Robert Lee Smith | -- | 53 | -- | -- |

EXHIBITS

| NO. | DESCRIPTION | ID | ADM |
|---|---|---|---|
| 1 | Lease Agreement | 8 | 31 |
| 2 | Letter from Smith to Fitzpatrick, 11-6-03 | 8 | 31 |
| 3 | Letter from Smith to Fitzpatrick, 1-6-04 | 12 | 31 |
| 4 | Transcript, 9-7-04 | 15 | -- |
| 5 | Court Order dated 9-10-04 | 15 | -- |
| 6 | Motion for Default Judgment | 20 | -- |
| 7 | 3/15 Letter to Fitzpatrick; Receipts | 22/29 | -- |
| 8 | Photographs (12) | 47 | 48 |

3

1                    (CALL TO ORDER)

2                    THE COURT: Please be seated.

3                    COURTROOM DEPUTY: Adversary case number 05-3030, Smith

4         versus Fitzpatrick.

5                    THE COURT: Good morning. Mr. Smith.

6                    MR. SMITH: Yes, sir.

7                    THE COURT: Good morning, sir.

8                    MR. SMITH: Good morning.

9                    THE COURT: And let's see.  Mr. Cavanaugh, you are

10        representing Ms. Fitzpatrick?

11                   MR. CAVANAUGH: Yes, Your Honor.

12                   THE COURT: All right.  Well, as I understand, here

13        what we have got is we have got a complaint to determine the

14        dischargeability of an indebtedness.  Let's see.  Mr. Smith,

15        you are representing yourself; is that correct, sir?

16                   MR. SMITH: Yes, sir.  I can't afford an attorney.

17                   THE COURT: Okay.  Well, I guess the way we will

18        proceed, you just plan to testify yourself?

19                   MR. SMITH: I can testify for myself, Your Honor, yes,

20        sir.

21                   THE COURT: Okay.  I mean, I guess my question was -

22        well, see, it is a little bit awkward.  Usually we have got a

23        lawyer and then the client takes the stand and testifies.  When

24        basically the client is representing himself, I think the thing

25        to do - now, do you plan to go first or were you going to call

4

1    Ms. Fitzpatrick first, or how did you want to proceed?

2            MR. SMITH: I can go first, Your Honor.

3            THE COURT: Okay.  Well, why don't you gather up

4    whatever papers you are going to want.  I see you have got some

5    papers there.  If there is anything you want me to look at that

6    you want to put into evidence, take it with you, and we will

7    swear you in and we will let you testify.  Or would you rather

8    testify - I guess we could -

9            MR. SMITH: I would be closer to the papers if I stay

10   here probably.

11           THE COURT: Why don't you go ahead and stand and, Mr.

12   Livingston, if you would swear in Mr. Smith.

13           (ROBERT LEE SMITH, WITNESS, SWORN)

14           THE COURT: Okay, Mr. Smith, one thing, you see we have

15   got microphones here.  Now, if you would rather just sit and

16   speak into the microphone there at the table, whichever is

17   convenient.  What I don't want you to do is wander betwixt and

18   between and that way we will miss what you are saying.  So just

19   pick one, either one, whichever is more comfortable for you.

20           MR. SMITH: I think I will sit right here.

21           THE COURT: That's fine.  Mr. Smith, the floor is

22   yours, sir.

23           MR. SMITH: Your Honor, this case, Your Honor, as I

24   understand it, is to determine whether or not a debt that I

25   presented to the court is owed to me, whether or not it should

5

1    be discharged.

2          To begin with, Mr. and Mrs. Fitzpatrick leased a home

3    from me.  It was my primary residence they leased from me.  I

4    would like to present first as Exhibit 1 a copy of the lease.

5          THE COURT: All right.

6          MR. CAVANAUGH: No objection.

7          THE COURT: Okay.  Why don't you just - actually if you

8    have got - why don't you just go through all of your documents

9    and hand them up and then Mr. Cavanaugh can look through them

10   to see if he has any objections.

11         So number one is the lease?

12         MR. SMITH: Yes, sir.  It is the lease.  And can I just

13   go ahead and talk about the lease a moment or just present the

14   documents first?

15         THE COURT: Well, I guess the thing is - whichever way

16   you think is better.  I would kind of prefer to see everything

17   at once.  If you think I need context, you can talk about them,

18   but I would kind of like to get a handful of stuff to look at.

19         MR. SMITH: Okay.  I have a copy of the lease.  That is

20   Exhibit No. 1.  I will lay it face down here for a moment.

21         THE COURT: Okay.

22         MR.  SMITH:  This  thing  ended  up  resulting  in  an

23   eviction on November 6, and I guess you could say it was set

24   aside because of a receipt issue that existed between Mr. and

25   Mrs.  Fitzpatrick  and  I,  the  landlord.   And  the  judge  did,

6

1    however, because they did not have the receipts for the months

2    in question, did require that they pay the rent for December

3    and - November and December of 2003.  And then they instructed

4    her to go ahead, and him, to go ahead and just file a separate

5    suit relating to the receipt issue.

6         So this particular hearing was the hearing that Mrs.

7    Fitzpatrick was present.  It was November - the eviction was

8    November 6 and the actual hearing was December 4, 2003.  She

9    attended that.  Mrs. Fitzpatrick attended that hearing.

10        THE  COURT:  So there  were  actually  two  different

11   lawsuits?

12        MR. SMITH: It is really one lawsuit.

13        THE COURT: One lawsuit, two different hearings?

14        MR. SMITH: Yeah, two different hearings is the way I

15   understand it.

16        THE COURT: All right.

17        MR. SMITH: But the first one was on December 4, 2003,

18   at  which Mrs. Fitzpatrick appeared and, to my surprise, I

19   didn't know that - I was evicting them for nonpayment of rent

20   but, when we got in there, I was surprised with a bunch of

21   receipts and the issue became whether or not they had paid

22   ahead rent or paid advanced payments or whatever term Mr. and

23   Mrs. Fitzpatrick might want to use to describe having paid more

24   months than they were in the property according to the lease.

25        THE COURT: Okay.

7

1          MR. SMITH: So I want to present a kind of working

2     representation of what happened as a result of that first

3     meeting that Mrs. Fitzpatrick attended.   I am going to mark

4     this Exhibit No. 2, and it shows everything that happened

5     during that time.

6          MR. CAVANAUGH: Your Honor, I am not sure when he says

7     a working exhibit.  I mean, is that some notes that he took or

8     is that –

9          THE COURT: Let's do this.  Let's just let Mr. Smith go

10    through his paper work and then, when he has got everything

11    identified,  because  all  we  are  doing  at  this  point  is

12    identifying, and then you can look through it and, if you have

13    objections to anything, we can take it up then.   And then what

14    I would prefer to do is simply admit what I can admit, exclude

15    anything if we have got to exclude anything, and then let him

16    tell his story from the documents and then we will switch to

17    your case.

18         So let's proceed that way.  It is a little bit awkward

19    because it is always a little bit awkward if you have got – you

20    know, because of the – but I am taking what he is saying right

21    now more in the way of argument or offering documents and not

22    really – and then we will get into the testimony.   You are, of

23    course, going to have a right to cross-examine if you choose

24    and then, of course, you will put your evidence on, if any,

25    later on.   But what I was going to try to do is get the

8

1    documents out first and then we will let Mr. Smith give his
2    testimony, tell his side of the story. So let's try to proceed
3    like that.

4        So we have got a lease, we have got some paper work
5    from your state court trial.

6        MR. SMITH: Yes, sir. Judge Givhan was presiding over
7    the trial and she was the one that instructed us, if we had -
8    there was a difference of opinion here about that. She said so
9    we are going to take it and separate it. We are going to make
10   - if you want to file a lawsuit, she told Mr. and Mrs.
11   Fitzpatrick that if you want to file a lawsuit, you can file a
12   separate lawsuit regarding the receipt issue but you are going
13   to have to pay the two months rent that was due as of December
14   4. So that's what happened.

15       And she also instructed them that during the time that
16   - if they filed the lawsuit, that during the time that this
17   lawsuit was being filed regarding the receipts, that they had
18   to keep the rent current. And what happened was in January the
19   rent was not paid on time again in accordance with the lease.
20   I again then filed another eviction action, which I was told I
21   could do.  At this point they were evicted by the judge
22   presiding over that hearing.

23       THE COURT: Okay.

24       MR. SMITH: And of course they have a right to an
25   appeal and they appealed it. So when they appealed it, they

1    then instructed them to pay the rent to the court.  It was six

2    hundred and fifty dollars a month according to the lease until

3    such time as a trial was had on it, and it went from the

4    District Court to the Circuit Court.

5         This created a real difficult problem for me because

6    I had never been in an appeal or anything like that on an

7    eviction, and the court was holding the money pending the

8    hearing to determine who was telling the truth about the

9    receipts.  So I made two or three pleas to the court to at

10   least let me receive the money so I could make my mortgage

11   payments, but they would not hear it.  They just set it for

12   trial.

13        What happened at the trial was, the next time we met,

14   Mrs. Fitzpatrick did not appear.  Mr. Fitzpatrick appeared by

15   himself.  He filed the document regarding the receipts even

16   though it was initially started under both of their names.  We

17   went back and forth with that issue with the receipts for

18   probably three to four months, and I think he concluded at the

19   same time that I did that this is going nowhere, it is taking

20   too long, and we both submitted paper work to have the case of

21   the receipts, which was the thing that was keeping the Circuit

22   Court appeal in place, married or combined with the receipt

23   issue, and that's what happened.

24        So in the interim there were at least two or three

25   other hearings we had regarding my effort to try and get them

10

1   out of the property so I could at least rent the property even

2   though they were keeping the money that had been collected, and

3   one of them was that the lease provided for me to have a right

4   of inspection of the property to see what kind of condition it

5   was in. And it has been my experience that, when there is some

6   kind of dispute between the landlord and tenants about

7   property, the bitterness sometimes results in the property

8   being trashed. So I wanted to at least get a look at the

9   property to see what kind of condition it was in, and I filed

10  an eviction to try and get that done, at least let me get in

11  there or let some representative I might employ get in there,

12  do a walk-through and do some kind of write-up on the status of

13  the property prior to the conclusion of the case.

14          I couldn't get in there to do a walk-through and,

15  needless to say, the property did get turned over to me in a

16  distressed position. It was returned to me in a distressed

17  position.

18          Eventually what happened, Your Honor, was it went to

19  trial. In the interim, I had spent probably three thousand, a

20  little over three thousand, four hundred or five hundred

21  dollars on an attorney initially. When the cost of the

22  attorney got more than the cost of the case for the receipts,

23  at that point I had to let the attorney go. I had paid her

24  more money than the case was about, so I asked her to

25  respectfully step down and let me take my case.

1          And then I went at it very aggressively.  Around June,

2     I sent out probably eight, nine or ten interrogatories for

3     questions that I had that I had never gotten answered by my

4     attorney that I had employed to help me with the case.  I never

5     got any replies to any of the interrogatories, and I sent them

6     two copies.  Since the appeal case was in the name of Michael

7     D. Fitzpatrick and Claudia Y. Fitzpatrick, everything I sent

8     out, I sent it out in duplicates, one to him and one to her,

9     and there was an area in there where I did specify who I

10    thought might be able to answer the question but any one of the

11    two was welcome to answer the questions.  None of them were

12    answered, Your Honor, none of the questions.

13          MR. CAVANAUGH: Your Honor, may I interrupt just

14    briefly?  I am not sure if these are witnesses for Mr. –

15          UNIDENTIFIED PERSON: No, I am supposed to be here to

16    meet my attorney here. I would like to know is he showing up

17    today in this courtroom?

18          THE COURT: Okay.  Do you have any paper work with you,

19    sir?

20          UNIDENTIFIED PERSON: I left it at home.  I came down

21    here the last time.  It was supposed to be on the tenth and

22    then on the thirtieth of this month.

23          THE COURT: Probably what you are here for is what we

24    call a section 341 meeting of creditors, and that will be – do

25    they do it next-door or two doors down?

12

1           MR. CAVANAUGH: 4-E usually, Your Honor.

2           THE COURT: Okay.  So the courtroom immediately next-

3     door here is where they do the 341 meeting of creditors, sir.

4           UNIDENTIFIED PERSON: Thank you, Your Honor.

5           THE COURT: Thank you, and the other gentleman?

6           MR. SMITH: These three people are all three with me.

7           THE COURT: Are they going to be testifying or are they

8     just here to observe?

9           MR. SMITH: They may be testifying, Your Honor.

10          THE COURT: Okay.  Let's do this.  I guess your point

11    in asking is you want a separation of witnesses if they are

12    going to testify?

13          MR. CAVANAUGH: Yes, Judge.

14          THE COURT: Okay.  Let me explain this, Mr. Smith.

15    Under the rules each party has the right to exclude the

16    witnesses of the other, so that one witness doesn't get to hear

17    what another is saying.  Are either of these two gentlemen

18    going to testify?

19          MR. SMITH: Yes, sir.

20          THE COURT: Well, here is what –

21          MR. SMITH: Your Honor, there may be one other person

22    still coming.

23          THE COURT: Okay.  What you can do is, gentlemen and

24    ma'am, if you could wait outside.  You can either sit in the

25    hallway or there are conference rooms immediately outside the

13

1    court door if you would prefer to sit in the conference room,

2    but I am going to have to ask you not to wait in the courtroom.

3              I understand.   I have testified several times as a

4    witness myself in cases.  I always find it dull to have to sit

5    around  a  conference  room  to  wait  until  it's  my  turn.

6    Unfortunately that's just the rule.  So if you could either

7    have a seat in the conference room - Bill, do we know -

8              COURTROOM DEPUTY: It is open.

9              THE COURT: So you can use the conference rooms if you

10   would like or, if you would prefer to sit out in the hallway,

11   whichever is more comfortable for you.

12             MR. SMITH: Do you want all of the -

13             THE COURT: Yeah, everybody who will or may testify,

14   so, yes, sir, everybody will need to leave.

15             Have we got all of the documents you want me to look

16   at?

17             MR. SMITH: I have got some more.

18             THE COURT: Okay.  What else have we got in the way of

19   documents?

20             MR. SMITH: I did indicate to Your Honor that after the

21   first eviction, they paid, and they got behind again, so they

22   were evicted - I mean, a notice was sent to them again to be

23   evicted and they were evicted.  In the letter, it shows that it

24   was dated January 6, and I would like to put it as Exhibit No.

25   3 because it is a procedure of the court, the district court,

14

1    that you have to send a ten-day letter of notice before you can

2    evict someone.

3             THE COURT: Okay.

4             MR. SMITH: And this document shows that I did what was

5    required by the court with the ten-day notice.  This is number

6    three.

7             We went to trial on or about the seventh of September.

8    Now, all of these intermediate hearings – we had two or three

9    intermediate  sessions  with  the  receipts  and  all  of  the

10   intermediate cases that preceded up to the ultimate case, which

11   was – the case number was CV-04-394.  All of these cases

12   according  to  the  court  order  required  that  Ms. Claudia  Y.

13   Fitzpatrick be present.  In other words, all three of us was

14   ordered to come to court for these various events.  And after

15   the first one, Ms. Claudia Fitzpatrick did not attend any other

16   events and it appeared to me that she had left the handling of

17   this matter to her husband even though she originally came at

18   the beginning herself with him on this matter.

19            So we had the trial.  The ultimate day of the trial

20   for CV-04-394 started with my testimony.  After which, Mr.

21   Fitzpatrick was able to ask me some questions, and I think in

22   the interim prior to that I actually called witnesses, some of

23   the people you see that just stepped outside, to testify to

24   various parts of this matter.

25            And then afterward, he took over and spoke and gave

15

1    his side of the story.  There were times in there where we

2    needed testimony from his wife since he was testifying about

3    receipts that supposedly she had paid, but she was not present

4    to testify.  So the judge ended up relying on the testimony of

5    Mr. Fitzpatrick.  I was not astute enough, since I am not a

6    lawyer, to know that in that case, in the conclusion if I had

7    just said that I would make a motion for default judgment, that

8    we would not be here, a default judgment against Mrs.

9    Fitzpatrick for not showing up and giving her side of the

10   story, but I didn't know that.  I just dealt with the issues at

11   hand in front of me.

12        What went on in that trial, Your Honor, I would like

13   to make an exhibit.  This is a copy of the transcript that I

14   paid about four hundred and some dollars to get that basically

15   says everything that happened - my testimony, Mr. Fitzpatrick's

16   testimony, anything that the judge may have intervened and had

17   done or said during the time.  So I am going to make this

18   Exhibit No. 4, the complete testimony of the trial.

19        When the trial was concluded, the judge took a short

20   recess for probably about a week, and he came back with a

21   decision on it, and I would like to make this decision that the

22   judge made Exhibit No. 5.  And this is his order and in his

23   order he says here that the court does not find defendant,

24   Michael Fitzpatrick, to be a credible witness and further finds

25   that the rent was not paid by the defendants, and he said that

1   plural.    Defendants, he said, all of them, so I guess that
2   includes him and his wife.    And he ordered and referred the
3   matter back to the district court and he ordered the court to
4   abide by his decision.    In effect that is what it says.    Abide
5   by his decision and to refund any monies that have been
6   collected by the court to me in regard to the matter.

7           So I am going to make this Exhibit No. 5, and I also
8   have - I can attach it to this if you would like since this was
9   associated with the order.    I have copies of the checks that
10  they gave me, the two checks that they gave me that equal what
11  they collected.    One of the checks was for seven hundred and
12  seventy-three dollars and the other one was for four thousand,
13  five hundred and fifty dollars, and I guess that is the total
14  of what they collected during that time associated with this
15  matter.    So his order and the checks that they gave me.

16          He sent the matter back to the district court and they
17  in turn followed through on his instructions and asked Mr. and
18  Mrs. Fitzpatrick to vacate the property.    It took a little
19  while for the district court to act on it, so I had to send
20  another letter in requesting that it be done fairly promptly
21  because I was still in distress from not having my property
22  repaired and do whatever needed to be done with it.

23          After that, Your Honor, I had suffered a great deal of
24  loss during this whole period.    It lasted about nine months.
25  During that nine month period, I must have been threatened at

1    least four or five times by the bank for the property they were

2    living in, that if I didn't bring my payments current, they

3    were going to foreclose on the property.  They even sent back

4    some partial payments I made of fourteen hundred or more

5    dollars because I was behind more than fourteen hundred dollars

6    on the property.  So I ended up during that time period having

7    to make choices because this was my home I let them move into.

8    It was a hundred some thousand dollar piece of real estate in

9    east Montgomery.  I had several other little properties that

10   were worth twenty-five to thirty thousand dollars.  So what I

11   ended up doing was –

12        MR. CAVANAUGH: Your Honor, I realize you are allowing

13   him some latitude to present his documents but it seems like we

14   are getting to the trial in chief.

15        THE COURT: I understand.

16        MR. CAVANAUGH: I really haven't had a chance to object

17   to anything he has been saying.

18        THE COURT: All right.  I understand he is testifying

19   in the narrative.  Some of what he is saying may arguably be

20   hearsay.  What I am going to do is I am going to accept what he

21   is saying as a proffer and we are going to sort it out at the

22   end.  I just want to hear his story.

23        MR. CAVANAUGH: Okay.

24        MR. SMITH: Well, as I was saying, I had to make

25   choices.  So I went and picked out three or four of the smaller

1    properties if I was going to lose something.  I didn't want to

2    lose anything.  But if I had to lose something, I didn't want

3    to lose my primary residence.  I would much rather lose some

4    smaller rental properties.  So I started taking money from the

5    rental properties and paying the payment on this house, this

6    hundred some thousand dollar house they were living in.  Of

7    course, there were legal fees involved that I pulled from these

8    houses to do.  I mean, I just started pulling money from other

9    houses to finance the lawsuit, to finance the payment of the

10   mortgage, to finance anything that had to be done, and I kind

11   of shuffled it around trying to hold them off, hoping the

12   courts would conclude the matter and I could keep all of my

13   properties, even though I would have been in a financially

14   distressed situation.

15        I lost them.  I lost four other pieces of real estate.

16   I also lost my truck.  I had a truck that I used to haul all of

17   my stuff in to repair and do work on my houses.  I lost the

18   truck, too.

19        Everything was primarily going to the bank to pay the

20   mortgages on all of these houses.  When my financial situation

21   got stretched, automatic bank drafts were coming in there,

22   checks were bouncing.  I mean, automatic bank draft types were

23   bouncing.  In addition to that, I had all of my personal

24   affairs on this account.  This was a personal account.  And my

25   insurance, my truck payments, my house payments, everything was

1    on this account.  My deal was to race to the bank every month,

2    put money in there to cover all of these drafts coming in, and

3    it was always - I had managed in a way that there were always

4    sufficient funds, there was no deficiency.  And I had overdraft

5    protection provided by the Alabama State Employees Credit Union

6    to catch anything that, because of the cash flow disturbance,

7    might happen, and there never would be five hundred dollars and

8    I had a five hundred dollar overdraft protection thing on that

9    account.

10        And ultimately the houses went, the truck went,

11    insurance policies lapsed, and I did finally write them.  I had

12    about four or five insurance policies, different types, long-

13    term care insurance, hospital insurance, that I have paid in

14    and I have never filed any claims against these places.  I have

15    always paid them on-time, automatic bank draft.  And I wrote

16    them and I asked them, I said send me copies of how much of the

17    premiums I paid into these things over the past two or three

18    years, and they sent me copies of them showing it.  And so part

19    of my claim includes those losses for those lapsed policies,

20    and we are talking in some cases three, four, five, six, seven

21    thousand dollars of premiums that was paid into various

22    policies that all lapsed and I didn't get them back.

23        So when it was over, what I did was the damage was

24    much greater.  It was much greater than the three thousand,

25    seven hundred and some dollars they were attempting to get, Mr.

1    and Mrs. Fitzpatrick, in terms of advanced payments or paid-

2    ahead rent.  And I went back to the court and I filed an action

3    to try and recover some of this loss, not to mention the fact

4    that the court in my opinion, while it was fair, it was a

5    little bit lenient in the end because I made a motion to

6    dismiss based on the owing of five hundred and some dollars of

7    rent that didn't get paid and I didn't get that, so I included

8    that, too.

9          At that time, I didn't know that Mrs. Fitzpatrick had

10   filed a bankruptcy.  I then got notice from her attorney that

11   she had filed a bankruptcy and that I was to discontinue any

12   collection action against her, lawsuit or anything, and I did

13   that.  And I instructed the Circuit Court not to do it and a

14   couple of times there it seemed like they were still attempting

15   to do something based on my prior instructions, so I wrote a

16   letter and told them put a piece of paper between me and them,

17   don't do it, don't contact her about any collection.

18         Mr. Fitzpatrick did not take any action to reply to

19   that suit and what happened as a result of it, and I would like

20   to make that Exhibit No. 6, is that I then made a motion to the

21   judge for a default judgment against Mr. Fitzpatrick, and the

22   judge in this exhibit I have, number six, granted that default

23   judgment.  He is still awaiting me to submit the dollar

24   amounts, I assume, of what I lost so he can consider that to

25   determine what kind of money he is going to assign to it, but

1    he did issue a default judgment on that, Exhibit No. 6.

2         Then I proceeded to get some assistance in this matter

3    right here in the federal court to undertake pursuing Mrs.

4    Fitzpatrick and, Your Honor, what I see as her aiding and

5    abetting of her husband in this matter because it was easy for

6    Mrs. Fitzpatrick at the beginning of this lawsuit when she did

7    attend the hearing to let the judge know, since she had been in

8    the property, her and her husband, approximately nineteen

9    months - they had receipts there reflecting they had been there

10   maybe twenty-two, twenty-three or more months - to tell the

11   judge that those did not represent paid-ahead rent or advanced

12   payments, but she did not deny the conclusion that was being

13   formulated or drawn regarding those payments being paid-ahead

14   rent or advance payments.  And it all centered around a couple

15   or three months.  One of those months was the month of March.

16        It has been my practice, Your Honor, with people,

17   helping them when they move into homes, that if they - even

18   though I have a canned lease that basically is already drafted

19   or written up and I give them a copy to review at least two or

20   three days before they sign it, it is my practice that if,

21   because of the moving costs and everything, they have some

22   problem coming up with a security deposit and the first month's

23   rent and having the utilities transferred or whatever, I will

24   allow them to pay, if it is the same, I will allow them to pay

25   the six hundred and fifty dollars if it is a six hundred and

22

1   fifty dollar property, like in this case, I will allow them to
2   pay the first month's rent and I will give them twelve months
3   to pay the security deposit.  They can either pay it in monthly
4   installments or it becomes due and payable in full at the end
5   of the anniversary of the signing of the lease twelve months
6   later.

7           And one of the issues in question in this matter is
8   the payment of the security deposit which twelve months later
9   is being claimed as a paid-ahead rent item or advanced payment,
10  and this was in March.  They signed the lease in March.  One
11  year anniversary from March, I contacted them by letter and one
12  of the ladies in the wheelchair outside is the one that does
13  all of my typing for these letters and everything.  She is here
14  to testify that this item I have here is an item that she
15  typed.  And I would like to make this item Exhibit No. 7.  And
16  it is dated March 15, Your Honor, and it is an eviction notice
17  being sent to Mr. and Mrs. Fitzpatrick informing them that the
18  anniversary one year in the property has arrived and that the
19  security deposit had not been paid and that, if they did not
20  pay it, they would get a ten-day notice that I was going to
21  take action to evict them from the property.

22          The error that I made when I did that was I allowed
23  them to pay the March rent one year later, due between the
24  first and the fifth, but I didn't ask them to pay all thirteen
25  hundred dollars on the first five days of March one year later.

1  I told them you can take two weeks spread and then pay me the

2  other but it has got to be paid in March.

3      So the letter went out around the fifteenth.  They

4  paid me on or about the fifteenth the money for the security

5  deposit, and I just wrote it out as - just by coincidence in

6  this case, the monthly rent was six fifty, the security deposit

7  was also six fifty.  And I wrote that out for six fifty and I

8  failed to put the word "security deposit" on it.  There was no

9  problem with that, though.  I didn't hear anything else about

10 that.  I knew what it was for and they knew what it was for.

11 So I didn't have a problem with that initially.

12     Then the next month something happened in the house.

13 Something broke or something, and they thought it was going to

14 cost a lot of money.  They had to move out of the house

15 temporarily into a hotel.  I think it set them back a little

16 bit financially.  It was the air-conditioner or something.  And

17 they asked me was I going to fix it and I said, "Well, what

18 does the lease call for as far as maintenance?"  I knew what it

19 called for.  For the first twelve months, in any lease I have,

20 I take care of all maintenance and everything.  After the first

21 twelve months, unless it is structural or major expenses, the

22 tenant takes care of the maintenance of the property.  And they

23 apparently looked at that and they saw that was the case and I

24 didn't hear anything else about it.  I don't think they was too

25 happy about it, though.

1          At any rate, what happened after that was they had
2    been having some problems paying the rent on time even before
3    then.  So what I did was I said, "Look, I am making too many
4    trips by here to collect the rent."  I said, "While it is not
5    my practice to let you mail it to me because you may say you
6    mailed it and I don't get it," I said, "I am going to go ahead
7    and let you all mail the payment to me."  This was in – the
8    security deposit was in March.  This was in April and May.  So
9    they mailed me the payment the first month.  I got it.  I
10   turned around and I wrote them a receipt even though they sent
11   the payment by money order for six hundred and fifty dollars.

12         I got a call from Mr. Fitzpatrick saying, "Hey, Mr.
13   Smith," several days later, "Did you get my payment on the
14   rent?"  I said, "Yes, sir, I did.  I sent you a receipt."  He
15   said, "Well, I didn't get one."  I said, "Well, give it a few
16   days and, if you don't get it, I will come by the house and
17   write you one."  I did that.  But the problem was he did get
18   the receipt, and I came by the house and wrote him another
19   receipt.  So he had the money order receipt in April and he had
20   two other receipts, the one that I mailed him that he say he
21   didn't get and he had the one that I brought to him.

22         The type of book that I was using at that time, and
23   nobody really before Mr. Fitzpatrick had ever paid much
24   attention to that, and me, because I don't think like that, it
25   is a receipt book that has receipts but it doesn't have a

1    carbon.  I haven't been doing this a long time.  I just started

2    this rental thing.  So when I write a receipt, it doesn't have

3    a prenumber on it, it doesn't have a carbon.  So if they say

4    they don't get it, I have got to write them another receipt and

5    now they have got two of them, and that is what happened in

6    this case, and I haven't had this problem with anybody else,

7    and  I  have  changed  my  receipt  book,  but  Mr.  Fitzpatrick

8    apparently noticed that when I was giving him receipts.  And

9    later on subsequently it seems like they attempted to take

10   advantage of that.

11          But, at any rate, he ended up with three receipts.  He

12   ended up with the money order receipt for six fifty.  He ended

13   up with the one I mailed him that he say he didn't get, and he

14   ended up with the one I personally brought by there and gave to

15   him.  I still didn't hear anything about that.  I didn't know

16   anything was going to come of that later.  I didn't even know

17   that had happened.

18          So May comes around.  That was March and April, and

19   now  they  have  got  that  extra  receipt  that  is  not  marked

20   security deposit.  They have got two extra receipts, plus the

21   Postal Service money order they mailed me, and here comes mail.

22   He mails me a payment again.  This time he is late and, Your

23   Honor, there is no - at this point in time I don't know he is

24   going to claim these receipts later, him and Mrs. Fitzpatrick.

25   I don't know this because I am thinking that the only receipt

1   they got is the one I took them.  So what happens is here comes
2   May and he mails me a payment, seven hundred and five dollars.
3   It was late.  The money order was postmarked around the seventh
4   of the month, and the lease says any payment made after the
5   fifth of the month is late and you must pay a ten percent
6   penalty.  So the payment should have been for seven fifteen.
7   Well, since I wasn't there personally collecting that money, he
8   was mailing it to me, he sent me a seven hundred and five
9   dollar postal money order.  I accepted it.  I needed to go
10  ahead and get that payment in to the mortgage company.  I
11  wasn't concerned about the five or ten dollars that he didn't
12  send me.  I got the majority of the money and I got the basic
13  payment.  So I sent him a receipt.

14          Now, from the time I get that money out of the mailbox
15  to the time I run to the bank and deposit it or send it off if
16  I have already done been to the bank, it may be two or three
17  days.  The one thing that I do know in my mind when I got that
18  was he met the minimum requirement.  He paid the minimum of six
19  fifty, plus the late fee, and I don't really get to keep the
20  late fee because I have to pay late fees to the bank and
21  anywhere else where there is bank drafts gone in and was turned
22  around at thirty, thirty-five dollars.  So I don't really count
23  that.  So I wrote him a receipt and, in my mind, every payment
24  is due on the first of the month and, if I get it on the
25  seventh or eighth of the month by mail, I write the receipt and

1    I date it for May 1.  In this case, it was a May payment, so I

2    put May 1 even though I may have gotten it on May 7, 8, or 9,

3    because he didn't buy the money order until the seventh.  But

4    I dated it, six hundred and fifty dollars, paid May 1, and

5    mailed it to him.

6        I got a call from Mr. Fitzpatrick.  "Mr. Smith, did

7    you get my payment this month?"  I said, "Yes, sir, I did."  I

8    said, "I sent you a receipt."  He says, "Well, I didn't get a

9    receipt."  I said, "Well, Mr. Fitzpatrick, it ain't doing me no

10   good for you to mail the payments if I have to keep coming out

11   here giving you receipts."  So I said, "Well, I will tell you

12   what.  Give it a day or two.  If you don't get your receipt,

13   call me back and I will bring you a receipt."  And I did that

14   again in May.  And after May when I brought him that receipt,

15   I told him right then, "We are discontinuing this mail thing."

16   I said, "If I have to come four or five times to you and Mrs.

17   Fitzpatrick's house to collect this money, I will have to do it

18   that way because it is not saving me any gas and time to have

19   to keep coming out here to give you receipts that you say you

20   don't get in the mail."  And still nothing had happened but

21   they got the receipts.  They got all of these extra receipts

22   now for these three months.  The security deposit that was

23   unmarked security deposit when they don't have proof of a

24   security deposit paid at the beginning, they have got it.  Two

25   payments in March.  They have got the money order, plus three

1    extra receipts in April, and they have got the money order,

2    plus three extra receipts, in May. From that point on, I came

3    around and collected the money again. Everything went

4    smoothly. They were late a time or two but they still paid me

5    and I got it.

6          Come around November, Mr. Fitzpatrick got hurt or

7    something, had an accident. When he got hurt, they couldn't

8    make the payments, and I told him, I said, "This is the worst

9    time of the year to have this problem." I said, "I will work

10   with you any time of the year but I have got too many tenants

11   that's having problems during Christmas and can't pay their

12   rent because they want to do Santa Claus." I said, "You have

13   got to get it. If you have to borrow from family or somebody,

14   you need to get it."

15         I gave him long after the ten days. I didn't file the

16   eviction letter until around the tenth - I mean around the

17   fifteenth of the month to have him evicted out of the house,

18   and that is when they surprised me with this incident.

19         So basically what happened, that was the issue about

20   the receipts. When we went to court, the rest of the testimony

21   is history in here.

22         THE COURT: Okay.

23         MR. SMITH: But Judge Hobbs heard the case and, when he

24   heard that case, Judge Hobbs was convinced, after listening to

25   my testimony and Michael Fitzpatrick's testimony, that he did

29

1    not pay the receipts.  He shifted and changed his story two or

2    three different times during the case and the judge was just -

3    after that, he didn't want to hear any more of it.  In that

4    testimony, one of the things but he said was - in this

5    transcript - was that the way he acquired the receipts - first,

6    he said he paid them off.

7            THE COURT: Why don't you gather up your exhibits and

8    just hand them to Mr. Livingston and then I am going to ask Mr.

9    Cavanaugh to look at them.

10           MR. SMITH: Okay.  I am going to put with that exhibit

11   - this one here is the receipts.  This is all of the receipts

12   when we started the investigation that Mr. Fitzpatrick had that

13   he said that he had paid, and I will make it Exhibit No. 7.

14           COURTROOM DEPUTY: Is that eight?

15           MR. SMITH: Is it eight?

16           COURTROOM DEPUTY: I believe it is eight.

17           MR. SMITH: Okay.  And I am going to put this exhibit

18   somewhere in the middle here.  This is all of the receipts that

19   I know of that they had.

20           Now, Your Honor, I want to say one thing.  Do you want

21   me to pick all of these up and give them to Mr. Cavanaugh?

22           THE COURT: Yeah, why don't you hand them to Mr.

23   Livingston.

24           MR. SMITH: The only other time, Your Honor - now,

25   those are all of the receipts that I know of that Mr.

1    Fitzpatrick had that he presented to court.  Now, the only
2    other opportunity I know that he may have tricked me out of a
3    receipt, and it has never been presented, he kept increasing
4    the number of receipts that he had as the story kept changing,
5    is if he seized the opportunity to have gotten a receipt at
6    some other time when I came with the -

7             THE COURT: Let's do this now.  These are Exhibits 1
8    through 7.  Mr. Cavanaugh, if you would take a minute and come
9    up and look and see if there is any objections you want to make
10   to any of those.

11             (Pause)

12             MR. CAVANAUGH: Your Honor, the only two - the ones I
13   would be objecting to are, first of all, the motion for default
14   judgment  with  regards  to  Robert  Lee  Smith  and  Michael
15   Fitzpatrick he granted on 9-20-05, filed on the sixteenth of
16   September, 2005, inasmuch as I don't see the relevancy of the
17   default against Mr. Fitzpatrick in the case here before the
18   bankruptcy court.

19             THE COURT: Okay.  Well, can you hand that one to Mr.
20   Livingston, and you said you have an objection to another
21   document?

22             MR. CAVANAUGH: And then with regards to Exhibit 5 and
23   4,  which basically - it is a little bit complicated.  We
24   actually had four hearings.  We first had a district court
25   hearing where Mr. Smith filed in November of 2003 for eviction

1    against Mrs. Fitzpatrick and her husband, Mr. Fitzpatrick.  I
2    think in his proffer Mr. Smith alluded to that where Judge
3    Givhan basically dismissed it without prejudice but ordered the
4    Fitzpatricks to go ahead and pay the November and December
5    rent, which basically brought them current, ignoring all of
6    this dispute about receipts, et cetera, brought them current
7    through December 31 of 2003.  And as Mr. Smith said, with the
8    proviso that they were to keep their rent current.  And as Mr.
9    Smith's proffer, Mrs. Fitzpatrick was there at that December,
10   I think, 4th hearing, 2003.

11           THE COURT: Let's just do this.  Let's not get into any
12   more long, convoluted argument.  We have got seven or eight
13   exhibits which are offered; is that correct?

14           MR. SMITH: Yes, Your Honor.

15           THE  COURT: You  are  objecting  to  six.   Are  you
16   objecting to anything else other than six?

17           MR. CAVANAUGH: No, actually I am objecting to five and
18   four.  These are –

19           THE COURT: So you are objecting to three of the six?
20   Four, five and six is what you object to?

21           MR. CAVANAUGH: Yes, Your Honor.

22           THE COURT: Okay.  So Exhibits 1, 2 and 3 can be
23   admitted without objection. Four, five and six, I am going to
24   simply hold under advisement.  I just want to hear the rest of
25   what is going to go on today.  I mean, I think, for example, I

1    am looking at six.  I think your objection is well taken on six

2    as to whether or not it is relevant.  The cause of action, I

3    keep reminding myself, is a 523(a)(2).  We are not really re-

4    trying the eviction proceedings from state court here except to

5    the  extent  that  they  may  have  some  -  there  may  be  some

6    background relevance.  So I am kind of struggling with that.

7    So I am simply going to take under advisement your objections.

8    I am going to go ahead and allow - we have got Exhibits 4, 5

9    and  6  are  marked  for  identification  purposes.    They  are

10   offered, and I will simply withhold -

11        MR. CAVANAUGH: Also No. 7, receipts, let me just

12   object to them for right now until Mr. Fitzpatrick testifies

13   and Mr. Smith testifies and there is a proper predicate.

14        THE COURT: All right.  That is fine.  Bill, why don't

15   you go ahead and take those back, put them in order, and then

16   you can take six here also.

17        All right.  So we have got your documents.  Mr. Smith,

18   I think I have heard your story.  Is there anything else you

19   wanted to offer?

20        MR. SMITH: Yes, sir.  In the documents, one or two of

21   them they objected to, particularly the transcript, was Mr.

22   Fitzpatrick's testimony regarding his wife having paid some of

23   the receipts.  Now, what he said was this: He told the judge,

24   he said this: That my wife and I were having some problems. She

25   put me out of the home and, in an effort to gain her favor, I

33

1   was continuing to work and pay the rent and Mr. Smith was going

2   by the house and also collecting rent. That is his explanation

3   for how the May, the April payments became what they were.

4           What I did, Your Honor, during the discovery of this

5   case was I sent some questions to Mrs. Fitzpatrick and I asked

6   her, I said, "Can you tell me, Mrs. Fitzpatrick, is there any

7   time during the term of the lease that you moved out of the

8   house?" Her answer was, "No." I then asked her, "Was there

9   any period of time during the term of the lease that Mr.

10  Fitzpatrick moved out of the house?" Her answer was, "No." So

11  that testimony – and I have got it here – the answers to her

12  interrogatories, question number two, shows direct conflict

13  between the testimony in the transcript of Mr. Michael

14  Fitzpatrick and the testimony of his wife regarding the

15  vacating of him from the home, and he said she put him out, and

16  she said she did not, to the best of her knowledge, he was

17  never out of the home. Certainly if his wife had put him out,

18  she would recall that she had put him out. So his explanation

19  of how they acquired the extra receipts is in direct conflict

20  with her testimony regarding the receipts.

21          Mrs. Fitzpatrick also testifies in the questions to

22  interrogatories I asked her, was, "Did you at any time

23  communicate or coordinate with your husband regarding the

24  payment of the rent?" Her answer to me in the interrogatories

25  was –

1            MR. CAVANAUGH: Your Honor, I am again going to have to

2       object to -

3            THE COURT: Right.  I agree with you a hundred percent.

4       We are getting pretty far afield.  What I want to do is I want

5       to give Mr. Smith about five more minutes to finish up his

6       story.  I am kind of struggling through the relevance problem.

7       Perhaps there may be some hearsay issues in there, but I just

8       want to go ahead and hear the rest of that.  We have been going

9       for almost fifty minutes.  I have heard your story out.  If

10      there is anything that you haven't told me yet, you need to

11      tell me now because we are getting to the point here where we

12      are going to close the plaintiff's case and then we will hear

13      from the defendant.

14            MR. SMITH: I don't know how far out I will be going,

15      Your Honor, but -

16            THE COURT: Well, here is the thing.  I am feeling like

17      we are re-living the whole landlord/tenant relationship.   I

18      mean, I have heard that.  But, you know, we are here in a fraud

19      case in bankruptcy court and you have offered the trial

20      testimony.  You have told me your side of the story.  Is there

21      anything further that you need for me to consider?  I just

22      can't let you ramble all day on who said what and when.  You

23      know, we need to get to the point.

24            Is there anything further that you would like for me

25      to consider?

Fitzpatrick - Direct                    35

1            MR. SMITH: Not at this time, Your Honor.

2            THE COURT: Okay.  Thank you.  All right.  Then we will

3    treat the plaintiff as having rested.  Mr. Cavanaugh, do you

4    want to offer anything or what is your preference?

5            MR. CAVANAUGH: I would like to call Mrs. Fitzpatrick

6    just briefly to the stand.

7            THE COURT: Okay.  That is fine.

8            (CLAUDIA FITZPATRICK, WITNESS, SWORN)

9                          DIRECT EXAMINATION

10   BY MR. CAVANAUGH:

11   Q.        Mrs. Fitzpatrick, with regards to the hearing or

12   initial eviction action that we had the hearing on December 4,

13   2003, in front of Judge Givhan, do you recall that hearing?

14   A.        Yes.

15   Q.        Okay.  Were you present at that hearing?

16   A.        Yes.

17   Q.        Okay.  Did you in any way testify at that hearing?

18   A.        No.

19   Q.        Did you make any statements at all about receipts or

20   anything of that nature?

21   A.        No.

22   Q.        Now Judge Givhan required or the court required that,

23   since you all could not provide proof of the November and

24   December payments, were you all to pay the November and

25   December payments; is that correct?

Fitzpatrick - Direct                                    36

1    A.        Yes.

2    Q.        And were those payments made?

3    A.        Yes.

4    Q.        So up until December 31, you all were, 2003, current

5    with the rent; is that correct?

6    A.        Yes.

7    Q.        Now Mr. Smith filed a second eviction action in

8    January or he sent a ten-day letter on January 6 and filed a

9    second eviction action on January 21, at which they had a

10   hearing in front of Judge McLemore on February 11, 2004. Were

11   you present at that hearing?

12   A.        No.

13   Q.        Well, obviously you did not make any statements then?

14   A.        No.

15   Q.        Likewise, your husband subsequent – Judge McLemore,

16   or the court at that point ruled in favor of Mr. Smith for the

17   eviction action. Did your husband subsequently file an appeal

18   to Circuit Court?

19   A.        Yes, he did.

20   Q.        Did you in any way file any type of appeal to Circuit

21   Court?

22   A.        No.

23   Q.        And during the time awaiting the appeal, to your

24   knowledge were the rent payments being made to the court on a

25   timely basis?

Fitzpatrick - Direct                    37

1    A.       Yes.

2    Q.       You heard about the hearing that Mr. Smith testified,

3    the Circuit Court appeal which apparently was consolidated with

4    the lawsuit that was brought by your husband against Mr. Smith

5    that occurred on September 7 in front of Judge Hobbs 2004.

6    Were you present at that hearing?

7    A.       No.

8    Q.       Did you make any type - well, you obviously did not

9    make any type of statements in that regard?

10   A.       No, I did not.

11   Q.       The hearing when you were evicted from the house at

12   that point, you heard Mr. Smith talk about damages briefly.

13   Were there any abnormal damage to the house when you all

14   vacated the house?

15   A.       There were no damages, nothing to the walls, the

16   carpet, anything like that.  The house was like it was when we

17   moved in.  It was like -

18   Q.       You didn't intentionally try to damage the house or

19   any of that nature?

20   A.       No.

21   Q.       And likewise he has alleged in his complaint that

22   part of the problem occurred for you not allowing him to come

23   and inspect the premises.  Did he ever come to you personally

24   to inspect the premises during the time you were occupying the

25   leased property?

1    A.        No.

2    Q.        Did you ever turn him away from the – you, yourself,

3    ever turn him away from the leased property?

4    A.        No, I never turned him away.

5              MR. CAVANAUGH: No further questions.

6              THE COURT: Okay.  Mr. Smith, are there any questions

7    that you would like to ask?

8              MR. SMITH: Yes, Your Honor.

9              THE COURT: All right.

10                         CROSS EXAMINATION

11   BY MR. SMITH:

12   Q.        Mrs. Fitzpatrick, at any time did you communicate or

13   coordinate with your husband regarding the payment of the rent?

14   A.        No, not all the time.

15   Q.        I beg your pardon.

16   A.        No, not all the time.

17   Q.        In an earlier interrogatory when I asked you that

18   question, you gave an absolute no, you did not communicate or

19   coordinate with him regarding the rent.

20   A.        Not all the time.  I mean, it was just some time, not

21   the majority of the time.

22   Q.        Did you and Mr. Fitzpatrick have a pet of any kind

23   that lived in the home?

24   A.        No.

25             MR. SMITH: Your Honor, I have copies of a cat that,

Fitzpatrick - Cross                    39

1    when I took possession of the home, every time I opened the

2    door, the cat ran in the house.  And at the time when I took

3    the house back, the carpet cleaners noticed blood in one of the

4    closets that looked like –

5          MR. CAVANAUGH: Your Honor, we would object.  He is

6    testifying.

7          THE COURT: All right.  Well, let's just do this: My

8    recollection was the question is did you have a cat and I think

9    you said, no; is that correct?

10          THE WITNESS: Right.

11          THE COURT: Then what I am going to let you do is I am

12    going to let you very briefly in your rebuttal case, if you

13    want to give testimony, but Mr. Cavanaugh is correct, it is not

14    appropriate just because you disagree with an answer for you to

15    start giving your side of the story.  I will give you a short

16    time to do a rebuttal case.  If you think it appropriate to

17    offer that testimony, you can do it then.  Why don't you just

18    simply move on and ask, if you have got any other questions for

19    Mrs. Fitzpatrick.  This is a standing objection.

20    BY MR. SMITH:

21    Q.        Mrs. Fitzpatrick, when you did attend the first

22    eviction hearing, was any of the receipts in that group of

23    receipts that Mr. Fitzpatrick, your husband, gave to the judge,

24    Givhan, were they receipts that you gave him?

25    A.        Some of the receipts in there were for me.

1    Q.        Okay.  So does that mean that you did understand and

2    you and Mr. Fitzpatrick had communicated regarding the matter

3    of there being more receipts than there was months that you had

4    resided in the property?

5    A.        No.

6    Q.        No, what?

7    A.        No, we didn't have a communication, you know, about

8    that.  All I know is when you came by the house and you wanted

9    to collect the rent, I gave you the money and that was it.

10   Q.        Did you know at the time you are alleging that I came

11   by the house and collected money that Mr. Fitzpatrick's

12   testimony is that he also had paid me money?

13   A.        No.

14   Q.        So you all never discussed whether or not you paid

15   the rent or he paid the rent each month?

16   A.        No.

17   Q.        And arbitrarily from month to month sometime, you

18   would just pay the rent without ever talking to your husband

19   about it?

20   A.        Yes.

21   Q.        Who kept the receipts?

22   A.        He did.

23   Q.        Has there ever been any time when you would pay the

24   rent at a location other than your home?

25   A.        No.

1    Q.        Was it your understanding when Judge Givhan took
2    those receipts and she looked at the lease and she counted the
3    number of months from the time the lease was signed to the time
4    of the hearing and the fact that there was more receipts there
5    than there was months that you had been in the property, did
6    you conclude that there were some excess receipts there?
7    A.        No.
8    Q.        Did you understand her when she said there was more
9    receipts there than there was months that you had been in the
10   property?
11   A.        Yes, I understood.
12   Q.        But you didn't understand that those receipts
13   represented excess number of payments made on the house?
14   A.        No.
15   Q.        What did you think?
16   A.        Really I just left that up to Michael because he
17   handled all of that.  You know, he told me that he didn't want
18   me communicating with you, that he wanted to communicate with
19   you as far as paying the rent and all of that.  So I didn't
20   know what was going on.
21   Q.        But as far as drawing a conclusion yourself mentally
22   about the number of months in the house versus the number of
23   receipts, you didn't have any conclusion that that meant
24   possibly that there were more payments made than there was
25   number of months in the house?

Fitzpatrick - Cross                          42

1    A.        No.

2    Q.        Was there any time that you received any kind of

3    communications from me, you and Michael Fitzpatrick, requesting

4    in accordance with the lease that I, or an agent I would

5    employ, be allowed to come in and to inspect the property.

6    A.        Repeat that again.

7    Q.        Was there any time during the terms of the lease that

8    you and Mr. Fitzpatrick received a request, a notice from me,

9    requesting that I be allowed or an agent that I would select to

10   come by the home and do an inspection of the property?

11   A.        No.

12            MR. SMITH: Your Honor, I do have a copy of an item

13   that was sent to Mr. and Mrs. Fitzpatrick. I would like to make

14   that the next exhibit.  I will have to put my fingers on it,

15   but I did send them a letter –

16            THE COURT: If you have a copy of it, you can show her

17   and ask her if she has any recollection of having received the

18   letter.  I will allow that.

19            MR. SMITH: Your Honor, I can't put my fingers on that

20   letter at this moment.

21            THE COURT: What we are going to do, then, is if you

22   have got any final questions for Mrs. Fitzpatrick, you can ask

23   them.  Then what we will do is we will let Mr. Cavanaugh ask

24   any redirect if he has any questions.  We will break for just

25   a few minutes and I will give you just a couple of minutes to

Fitzpatrick - Cross                              43

1     look to see if you can find it and then we will hear your

2     rebuttal case if you want to put anything on, and then we will

3     wrap it up.

4                So  do  you  have  any  more  questions  for  Mrs.

5     Fitzpatrick?

6                MR. SMITH: Yes, sir, I may have one or two.

7                THE COURT: Okay.

8     BY MR. SMITH:

9     Q.        Mrs. Fitzpatrick, why did you not attend the hearings

10    even though you were ordered by the court to attend?

11               THE COURT: Well, now, wait a minute.  First of all, I

12    suspect she wasn't ordered to attend.  Second of all, we have

13    got nothing in the evidence to show that she was ordered to

14    attend.  Third, that is argumentative.  You have got to really

15    ask her a question.  She gave some testimony and I understand

16    your questioning some of that but you are trying to testify

17    through the witness and that is just not going to work.

18               So I am going to give you a few minutes to rebut their

19    case but what I have got to ask you to do now is you have just

20    got to ask her questions, and I understand, you know, that you

21    may not accept some of the answers but you are kind of stuck

22    with that for the time being.  You have just got to ask her

23    whatever you want to ask her and I am not going to give you an

24    opportunity for you to give your testimony or your reasons as

25    to why you think things that she may be testifying to is

Fitzpatrick - Cross                    44

1    incorrect.  So you need to just confine yourself to asking her

2    anything further you want to ask her.

3    BY MR. SMITH:

4    Q.         Mrs. Fitzpatrick, you say you did give your husband

5    some of the receipts that was presented to Judge Givhan.  Which

6    receipts did you give him?

7    A.         I can't recall at this time.  I can't recall the

8    dates.

9    Q.         Were any of those receipts for advanced payments or

10   paid-ahead rent?

11   A.         No.

12   Q.         Was any of them late payments?

13   A.         No.

14             MR. SMITH: That's all I have, Your Honor.

15             THE COURT: All right.  Thank you.  Mr. Cavanaugh, any

16   redirect?

17             MR. CAVANAUGH: No redirect, Your Honor.

18             THE COURT: Thank you, ma'am.  You may step down.  Mr.

19   Cavanaugh, is there anything else you wanted to offer?

20             MR. CAVANAUGH: No, Your Honor.

21             THE COURT: Okay. Here is what we are going to do.  We

22   are going to break for about five minutes.  Mr. Smith, that

23   will give you a little bit of time to look for that letter you

24   had said, also get your thoughts together if there is anything

25   else.

45

1    MR. SMITH: Can I call my witnesses at that time?

2    THE COURT: What are they going to testify to?

3    MR. SMITH: One of them who is the professional typist

4    is going to testify to the documents that Mrs. Fitzpatrick said

5    she never received that I sent to her.

6    THE COURT: Well, are these the documents here that you

7    have already offered into evidence?

8    MR. SMITH: They are just some documents that I still

9    have here.

10    THE COURT: That you have not offered them yet?

11    MR. SMITH: Yes, because I didn't know at the time,

12    based on her testimony, which ones I was going to need to

13    introduce.

14    THE COURT: Well, here is what I want you to do.    I

15    don't think Mr. Cavanaugh is going to dispute that these

16    documents were typed up.    So -

17    MR. SMITH: The other testimony is testimony of

18    witnesses regarding what has been my - since we are talking

19    about the receipts and the security deposit, what has been my

20    practice with allowing the tenant to pay the security deposit

21    twelve months later.

22    THE COURT: Okay.    To the extent that is relevant, I

23    suspect that is not going to be really disputed.    So I will let

24    you just proffer that.    Let's do this: We are going to break

25    for five minutes.    I want you to go through your paper work.

46

1    If there is anything else you think needs to be offered, then

2    go ahead and offer it.  If there is any other testimony you

3    want to give, we are going to do that, but we are not just

4    going to relive the landlord/tenant relationship.  We are in

5    bankruptcy court here.  We have got a complaint to determine

6    the dischargeability of an indebtedness and we are going to try

7    to stick to that and, at times, I think we have wandered pretty

8    far afield.  So we are going to try to stick closer to what we

9    have got to do here.

10        So we will break for five minutes and then I will hear

11   again from you, Mr. Smith.

12        (Recess from 10:36 p.m. until 10:49 p.m.)

13        THE   COURT:  We   are   here   on   the   Smith   versus

14   Fitzpatrick.   We  have  heard  the  case  in  chief  from  both

15   plaintiff  and  defendant.   We  are  now  in  the  plaintiff's

16   rebuttal case. Mr. Smith, just to let you know, we don't redo

17   the  whole  thing  but,  if  there  is  any  points  you  think  are

18   particularly  important,  particularly  if  you  think  –  you

19   remember  one  of  the  things  you  asked  Mrs.  Fitzpatrick  a

20   question and then you started wanting to offer something to

21   show that you disagreed with what she said and I kind of cut

22   you off.  Well, now is the time if you want, if that is a point

23   you want to pursue, that's the kind of thing you can follow-up

24   with now.

25        MR. SMITH: Yes, sir.  Your Honor, I do have pictures

47

1    I would like to present into evidence.

2        THE COURT: Okay.

3        MR. SMITH: One of them in particular shows the cat

4    running away from the house.

5        THE COURT: How many photographs do you have there?

6        MR. SMITH: I have twelve of them.

7        THE COURT: Okay.  So we are going to have Plaintiff's

8    Exhibit 8 is an array of twelve photos.  Is that the number we

9    are on?

10       COURTROOM DEPUTY: Eight, right.

11       MR. SMITH: The other thing I would like to introduce

12   here now is, Your Honor, Mrs. Fitzpatrick testified that she

13   didn't keep the receipts and that she didn't know what months

14   that she gave him the payments for.  I did take the receipts

15   and put them in an order and that order -

16       THE COURT: Now you have already offered some copies of

17   receipts, I believe; is that correct, sir?

18       MR. SMITH: Yes, but they were not in order.  They were

19   just receipts given to me, scattered all about, and I organized

20   them in accordance to what months they represented.

21       THE COURT: I see.

22       MR. SMITH: And when I did that, what I found was they

23   are showing in March of 2003 that they paid thirteen hundred

24   dollars.  The rents for that month, plus they are saying an

25   extra payment which I am claiming was a security deposit.  In

48

1   April, they are saying that they paid six hundred and fifty

2   dollars three times.   One thousand, nine hundred and fifty

3   dollars in April.   They are also saying that in May they paid

4   two thousand, five dollars.   For a total in ninety days of five

5   thousand, two hundred and fifty-five dollars.

6        It was represented to me that Mrs. Fitzpatrick was a

7   teacher's assistant, I think was the term she used, teacher's

8   assistant.   And Mr. Fitzpatrick said that he was a truck driver

9   but I understand later he had stopped driving trucks and he was

10  working in the food service business.   So they are saying in a

11  ninety-day period they paid five thousand, two hundred and

12  fifty-five dollars for rent.

13       MR.   CAVANAUGH: I am going to object.   We didn't

14  testify to that.   This is rebuttal and he is trying to offer

15  additional  evidence  that  is  not  appropriate  for  rebuttal

16  purposes.

17       THE   COURT:   Okay.   Let's start with Exhibit 8, the

18  array of twelve photographs.   Have you looked at those, Mr.

19  Cavanaugh?

20       MR. CAVANAUGH: Yes, sir.

21       THE COURT: Any objection to those?

22       MR. CAVANAUGH: No objection, Your Honor.

23       THE COURT: Okay.   So Exhibit 8 is admitted.   Now as

24  far as Mr. Smith's testimony about this five thousand, two

25  hundred and fifty-five dollars, I mean that is just testimony.

49

1    That is not an exhibit.  I mean, that is testimony you are

2    offering?

3         MR. SMITH: Yes.

4         THE COURT: Okay.  So here is what I am going to do.

5    Why don't you just make a note of that.  I will let you cross-

6    examine him on that point if you choose to.

7         MR. SMITH: The other thing, Your Honor, is in Mrs.

8    Fitzpatrick's testimony she said that, if I recall correctly,

9    that she received no correspondence from me regarding a request

10   to her and her husband to inspect the property.  I have a

11   letter dated here November 20, 2003, with a copy I set up

12   called a suggested quick and easy response sheet requesting to

13   gain entry to the property for an inspection.  This is dated

14   November 20, 2003, and then –

15        THE COURT: But does that really relate to what we are

16   doing here today?

17        MR. SMITH: Her testimony was that if I had asked her

18   to come in, if I had come and asked them to gain access to do

19   a walk-through inspection, that they would have let me do it.

20        THE COURT: I recall her testimony that you are making

21   reference to.  I see there is a difference between what you are

22   saying and what she is saying, but does that really matter?

23   Does that really relate to your cause of action here?  I mean,

24   I thought we were talking about the business about the multiple

25   receipts.

50

1          MR. SMITH: Well, I just wanted to clear that up and –

2          THE COURT: Well, I appreciate that.

3          MR. SMITH: These are the documents that I sent to them

4     and these are the documents that I took action on in an attempt

5     to evict them.

6          THE COURT: Okay.  Why don't you go ahead and mark

7     those, then.

8          MR. SMITH: For breach of contract because they signed

9     a lease saying they would allow the inspection.

10         Now, another thing she testified to was that she

11    always paid me at the house, that she never paid me any other

12    place.

13         THE COURT: Right.  I do recall that testimony.

14         MR. SMITH: I do have a document here.  It wasn't sent

15    to them but it was a document that was sent to counsel when I

16    had one, and in this document I make reference to the fact that

17    she did pay me occasionally and that the meeting place for

18    paying me was near my home at the time and that was the

19    Hardee's on the corner of Lower Wetumpka Road and Johnson

20    Avenue in Montgomery.

21         THE COURT: Okay.

22         MR. SMITH: So this letter was dated February 19, 2004,

23    making reference to the fact that she did pay me at a place

24    other than home and, whenever I am paid at someplace other than

25    home, it is because the payments are late.  It is not because

51

1    of advance payments. I come to the house between the first and

2    the fifth and, if they don't pay me when I come, then they have

3    to bring the payment to me. So the payment she made in most

4    cases were payments that she brought to me at a meeting place

5    we agreed on which was the Hardee's on the corner of Lower

6    Wetumpka Road and they were late payments.

7             THE COURT: Okay.

8             MR. SMITH: This document shows that. The other thing

9    is, Your Honor, the receipts for May that shows the seven "o"

10   five, if you look at it, it negates all of the other receipts

11   because it was an attempt by Mr. and Mrs. Fitzpatrick to send

12   the payment and include the late fee, seven "o" five when it

13   should have been seven fifteen. Now if they had already paid

14   in March an extra payment and if they had already paid two

15   extra payments in April, there would be no need, even if they

16   wanted to send a payment extra in May, to send a seven "o" five

17   payment. Do you see what I am saying?

18            THE COURT: Yes, sir.

19            MR. SMITH: So that would mean that everything ahead of

20   that must have not been what they say it was if they was

21   attempting to pay a late fee because it would not have mattered

22   when they paid the payment in May extra, it would not have been

23   late, it would have been early.

24            THE COURT: Okay.

25            MR. SMITH: So I am saying the seven "o" five payment

1    really shows that all of the other claims ahead of the seven

2    "o" five payment were not correct, they were not true, because

3    there was no need to pay seven "o" five if in fact they had

4    paid all of those months ahead in March and April, is what I am

5    trying to say.

6         I think in a nutshell, Judge Givhan put it best when

7    she said, and she referred this case, she would not rule on it.

8    She referred it to the Circuit Court even though we requested

9    it be sent there because it was taking so long.  Her remarks

10   was, and I would like to submit this into evidence, she sent

11   this copy to both of us.  She said that I was - the defendant

12   is represented by an attorney.  The court finds that the issue

13   of the rent receipts of the defendant is on appeal to the

14   Circuit Court, which is the same issue at bar with the Circuit

15   Court issue.  The Circuit Court issue was convict them and they

16   had appealed it.  And Judge Givhan is saying these two things

17   are so interwoven that you can't deal with the eviction without

18   dealing with the receipt issue because that is what is holding

19   the - the glue that is holding this together, is that they say

20   they paid advanced payments.  And so Mrs. Fitzpatrick's

21   representation with her husband on the first meeting of the

22   receipts in fact put her intact with whatever happened after

23   that regarding the eviction.  Her representation then followed

24   through all the way through to the end when the judge finally

25   decided that it was not true what they were saying and that

1    they should move out of the property and I should get the

2    money.

3              So she represented at the very beginning with her

4    husband and she did never - she never denied it. She never

5    ever denied the conclusions that were being drawn by Judge

6    Givhan or anyone else that the payments were not paid-ahead

7    rent and they were not advanced payments. She never denied

8    that. She simply sat there, stood, and gave her husband the

9    receipts and remained silent regarding the conclusions that

10   were being drawn about that. And throughout this testimony -

11             THE COURT: I think you have made that point. I recall

12   you gave some testimony in your case in chief on that. I

13   understood that.

14             Mr. Cavanaugh, do you have any questions for Mr. Smith

15   in the way of cross-examination simply on, of course, what he

16   has given us in his rebuttal case?

17             MR. CAVANAUGH: Just one.

18                         CROSS EXAMINATION

19   BY MR. CAVANAUGH:

20   Q.        Mr. Smith, when you are talking about Givhan's order

21   or you are offering to present, that is the order on Mr.

22   Fitzpatrick's lawsuit against you that was filed in December;

23   is that not correct? It was not the eviction hearing that you

24   all had in December or it is the lawsuit that Mr. Fitzpatrick

25   filed against you in her court on December 23 that Mrs.

Smith - Cross                                    54

1    Fitzpatrick is not a party of?

2    A.        That's not correct.

3    Q.        But the hearing that you all had, the eviction

4    hearing, that one was dismissed without prejudice once Mr. and

5    Mrs. Fitzpatrick paid the November and December payments,

6    bringing them current; was it not?

7    A.        The eviction of November 6 was dismissed, yes.

8            MR. CAVANAUGH: No other questions.

9            THE COURT: Okay. I will give everybody one last

10   chance just to sum up very briefly what you think you have

11   shown. Mr. Smith, in five minutes or less if you would like to

12   tell me what you think the evidence has shown and what

13   conclusions you think I ought to draw from it.

14           MR. SMITH: Your Honor, I think that the best point I

15   can make is that, granted, the November 6 eviction once they

16   paid the rent was set aside but then they defaulted again on

17   January 6 and, on January 6, it was an eviction again and,

18   during that time, the receipt issue was still the issue, the

19   driving force in this whole process. It was the issue.

20           Even though Mr. Fitzpatrick presented the receipts,

21   the receipts reflected the receipts that Mrs. Fitzpatrick also

22   claimed she paid. So without the receipts that Mrs.

23   Fitzpatrick is claiming that she paid, then the five thousand,

24   some hundred dollars of extra money would not have been there.

25           THE COURT: Wait a minute. Okay. I am sorry.

1    MR. SMITH: So what I am saying is, had it not been for

2    the receipts that Mrs. Fitzpatrick also gave her husband in

3    representing the receipt issue, there would not have been the

4    reflection or the appearance of advance payments. So in that

5    regard, she assisted, aided and abetted her husband in

6    presenting the appearance to the court that these were

7    overpayments, paid-ahead rent, advanced payments or whatever

8    term describes paying more rent than is required in accordance

9    with the lease. And she never denied it when the court acted

10   on that. She maintained silence when she should have clarified

11   it, you know, as a matter of record that they were not advanced

12   payments.

13        So in that regard, she assisted her husband. She

14   never came forward and testified to clear that matter and clear

15   the air and, as a result, her husband ended up having to keep

16   shifting his story back and forth trying to convince the judge

17   and have it make sense and, in spite of all of that, he was

18   unable to do that.

19        Now, the key is this: Had Mr. Fitzpatrick been

20   successful, the checks that I received and everything shows

21   that the payment would have been made to Michael and Claudia

22   Fitzpatrick, just like the check that I received reflected

23   payment to me for prevailing in this case from Michael and

24   Claudia Fitzpatrick. It was not from Michael Fitzpatrick. It

25   was from Michael and Claudia Fitzpatrick. So she stood to

56

1    benefit by her actions of not clarifying and clearing up the

2    matter and, in that regard, I feel that she is just as

3    responsible as Michael Fitzpatrick. She stayed in the home the

4    entire time. She did not move out of her home, which gives the

5    appearance that she felt that she was correct and her husband

6    was correct and he was doing what was in the best interest and

7    correct for the both of them.

8         So, I mean, like I say, the only thing that caused us

9    to be in this court today after the representation made in the

10    state court is the fact that I am not an attorney and I failed

11    to use the words in the closing that I would like to make a

12    motion to have a default judgment issued against Ms. Claudia

13    Fitzpatrick.

14         THE COURT: All right. Thank you, sir. Mr. Cavanaugh.

15         MR. CAVANAUGH: Your Honor, I think the key thing, the

16    plaintiff is basically traveling again under 523(a)(2)(A) for

17    money or property by false pretenses. As his own testimony and

18    Mrs. Fitzpatrick's testimony that at the eviction hearing in

19    November or December of 2003, Mrs. Fitzpatrick made no

20    statements, Judge Givhan obviously did not completely believe

21    Mr. Fitzpatrick because he ordered them to pay the November and

22    December payments since they couldn't prove they paid the

23    November and December payments. So as of December 31, Mr.

24    Smith had suffered no harm.

25         He then filed the second eviction action in January of

57

1    2004.   Mrs. Fitzpatrick did not even attend that eviction

2    hearing.   Mr. Fitzpatrick lost at that hearing.   The court

3    order, he then appealed, which is his legal right to appeal the

4    district court for a trial *de novo* at Circuit Court, posted the

5    bond.   Thereafter made the payments to Mr. Smith through the

6    court.

7            Now, granted, the court might or might not have

8    released it and I am not sure what Mr. Smith could or could not

9    have done during that time frame to get his money but both of

10   the Fitzpatricks were making the payments during that time

11   frame.   Mr. Smith was really not suffering any damages.

12           At the hearing in front of Judge Hobbs in September

13   '04 at the Circuit hearing, again Mrs. Fitzpatrick did not

14   appear, did not make any statements, did not do any type of

15   fraud.   So, again, under the only section that I think the

16   plaintiff could be traveling under on 523, there is no false

17   pretenses that he is relying upon that caused him any type of

18   loss.

19           With regards to – you know, he had some other accounts

20   about some damage to property.   Again, under 523, I think –

21   again, Mrs. Fitzpatrick denied having a cat.   Whether you have

22   a cat or not, I don't think that would rise to the level of

23   willful and malicious injury of the debtor or the property – I

24   mean by the debtor of another entity or the property of an

25   entity.   So I don't think Mr. Smith has carried his burden on

58

1    either one of those grounds.

2             THE COURT: All right. Well, thank you both. I think

3    the case has been well tried. I am going to take it under

4    advisement. We will get a written decision out. You can

5    expect it - I will plan to have it out in less than thirty

6    days. So you will be getting the decision in the mail.

7             Thank you both.

8             (Off the record at 11:09 a.m.)

59

## C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Patricia Basham, Transcriber

Date:  March 20, 2006